**UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION**

UNITED STATES OF AMERICA,

       Plaintiff,

                                      Case No. 07-20067

v.                                        Hon. Gerald E. Rosen

HOA LE CHEN,

       Defendant.

_____/

**OPINION AND ORDER DENYING
DEFENDANT'S MOTION TO SUPPRESS EVIDENCE**

At a session of said Court, held in
the U.S. Courthouse, Detroit, Michigan
on    March 10, 2008

PRESENT:  Honorable Gerald E. Rosen
                    United States District Judge

Defendant Hoa Le Chen, along with her ex-husband, Defendant Guan Han Chen, is charged in a February 14, 2007 indictment with a single count of harboring illegal aliens in violation of 8 U.S.C. § 1324(a)(1)(C).[1] Through the present motion, Defendant seeks to suppress the oral and written statements she gave to federal Immigration and Customs Enforcement ("ICE") agents shortly after her arrest on January 31, 2007. In

---

[1]Although the indictment cites 8 U.S.C. § 1324(a)(1)(C), Defendant has pointed out in a subsequent motion that the relevant statutory provision is found at 8 U.S.C. § 1324(a)(1)(A)(iii), which prohibits the "conceal[ment], harbor[ing], or shield[ing] from detection" of "an alien [who] has come to, entered, or remains in the United States in violation of law." While the Government has promised to file a motion to amend the indictment to correct this clerical error, it has yet to do so.

support of this motion, Defendant contends that her statements were not voluntarily given, but instead were the product of coercion.

The Court initially addressed Defendant's motion, along with several other matters, at a hearing on May 11, 2007, and then convened a separate evidentiary hearing on this motion on July 26, 2007, at which the Court heard the testimony of Defendant and federal ICE agents Stephen Clark and George Golliday. At the conclusion of the evidentiary hearing, the parties were invited to file supplemental briefs addressing the legal standards for coercion in light of the testimony at the hearing. Having reviewed the parties' written submissions in support of and opposition to Defendant's motion, and having considered the testimony of the witnesses and the arguments of counsel at the hearing, the Court now is prepared to rule on this motion. For the reasons stated below, the Court finds that Defendant's motion must be denied.

## I. FACTUAL AND PROCEDURAL BACKGROUND

The single-count indictment in this case charges Defendants Hoa Le Chen and Guan Han Chen with "conceal[ing], harbor[ing] and shield[ing]" two illegal aliens, Jose Zetina-Hernandez and Antonio Cupido-Alcudia,[2] at Defendants' shared place of residence on Sunrise Drive in Ypsilanti, Michigan.[3] According to the testimony of

---

[2]The latter individual is identified in the indictment as Antonio Cupido-Alcuida, but it appears from other materials in the record that the correct name is Antonio Cupido-Alcudia.

[3]Defendants Hoa Le Chen and Guan Han Chen were married in 1994 and divorced in 2003, but they continued to share a residence during the time period of relevance to this case, late 2006 through early 2007.

2

Immigration and Customs Enforcement ("ICE") special agent Stephen Clark at the evidentiary hearing on Defendant's motion, the Government first began to suspect that Defendants might be harboring illegal aliens at their home when, in connection with a different investigation, ICE agents observed a Mexican national in the garage of this home in August of 2006.

In a subsequent visit to Defendants' residence on January 23, 2007, ICE agents observed two Mexican nationals emerge from the garage and enter a vehicle parked in the street. Upon approaching the vehicle and interviewing these individuals, the agents were told that the two men were in the country illegally and that they lived in the basement of Defendants' residence. According to Agent Clark, one of these individuals, Antonio,[4] asked to retrieve his coat from the basement of the home, and Agent Clark and two other agents accompanied him back to the residence to do so. Agent Clark further testified that Defendant Hoa Le Chen answered the door and permitted Antonio and the agents to enter the home.

As the agents and Antonio went down to the basement, they were accompanied by Defendant, who purportedly stated that there was nobody else in the basement. Upon opening the doors to the various rooms in the basement, however, the agents discovered another Mexican national, later identified as Jose Zetina-Hernandez,[5] hiding behind the

---

[4]Although Agent Clark's testimony is not clear on this point, this individual presumably was Antonio Cupido-Alcudia, one of the two illegal aliens identified in the indictment.

[5]Zetina-Hernandez is the second of the two illegal aliens identified in the indictment.

furnace in one of the rooms. The agents then retrieved Antonio's coat and left.[6]

Based on this encounter and additional information derived from sworn statements given by Cupido-Alcudia and Zetina-Hernandez, warrants were issued for the arrest of Defendants Guan Han Chen and Hoa Le Chen. These warrants were executed on the morning of January 31, 2007 at Defendants' home on Sunrise Drive in Ypsilanti. According to the testimony of Agents Clark and Golliday, eight to ten agents participated in the execution of the arrest warrants, entering Defendants' residence at about 9:00 a.m. with their weapons drawn. Agent Clark testified that both Defendants were found in an upstairs bedroom, and were then taken downstairs, handcuffed, and placed on a couch in the living room while the agents searched the home for other occupants. Defendant Hoa Le Chen testified, however, that she and co-Defendant Guan Han Chen were in their own separate bedrooms when the agents entered the house, and that she was not placed on a couch while the agents searched the home, but instead was forced to kneel on the living room floor as the agents pointed their guns at her. In all, the execution of the arrest warrants took about an hour, and Defendants then were transported in separate vehicles to the ICE office in Detroit, with Defendant Hoa Le Chen testifying that she remained handcuffed throughout this trip.

---

[6]Prior to their deportation, Cupido-Alcudia and Zetina-Hernandez were deposed by the parties. Both men confirmed that they were in the United States illegally, and both men testified that they lived for a time in the basement of Defendants' residence. The men also testified that they worked for a time at a restaurant owned by Defendant Guan Han Chen, the New Garden Buffet, and they referred to Defendant Hoa Le Chen as one of the "bosses" at the restaurant. (See, e.g., Zetina-Hernandez Dep. at 12, 16; Cupido-Alcudia Dep. at 24-26.)

4

In their testimony at the evidentiary hearing, the ICE agents and Defendant[7] offered widely divergent accounts of what transpired upon their arrival at the ICE office. According to Agents Clark and Golliday, they commenced their interview of Defendant — with both agents present throughout — by using a standard form to advise her of her rights in accordance with Miranda v. Arizona, 384 U.S. 436, 86 S. Ct. 1602 (1966), and then obtaining her signature on this form indicating that these rights had been explained to her, that she fully understood them, and that she waived these rights "freely and voluntarily, without threat or intimidation." (Gov't Ex. 1.)[8] Agent Clark testified that Defendant declined an offer of an interpreter, and both agents testified that she did not appear to need an interpreter or otherwise evidence any difficulty in understanding their questions.

According to Agent Clark, Defendant was interviewed for about an hour after signing the Miranda waiver. Agent Clark testified that Defendant initially provided answers that were inconsistent with the information provided by the Mexican nationals found at her home, but that she changed her responses upon being informed of these inconsistencies. Agent Clark further testified that, during the course of this interview, Defendant admitted that Mexican nationals had been employed at the New Garden Buffet

---

[7]Throughout the balance of this opinion, the Court will refer to Hoa Le Chen as the sole "Defendant," as it is her motion that is presently under consideration. When it is necessary to refer to co-Defendant Guan Han Chen, the Court will identify him as "Mr. Chen."

[8]This form indicates that Defendant signed the waiver of her Miranda rights at 10:40 a.m., and Agent Clark testified that he and Defendant arrived at the ICE office a few minutes earlier, at around 10:30 a.m.

5

restaurant and had lived at the Sunrise Drive residence, and that she knew that these individuals were in the country illegally. Similarly, Agent Golliday testified to Defendant's statements that illegal aliens had worked at the restaurant and lived at the home where Defendant resided. In addition, the Government introduced the two agents' notes from their interview of Defendant, in which both agents recounted Defendant's statements that illegal aliens had been employed at the restaurant and had lived in rooms in the basement of her home. (See Gov't Ex. 2 (Agent Clark's notes), Ex. 2a (Agent Golliday's notes).)

According to the agents, Defendant agreed at the conclusion of the interview to memorialize her oral responses in a written statement. In this one-page statement, which reflects a date and time of January 31, 2007 at 11:35 a.m., Defendant stated that she lived at the Sunrise Drive residence and owned the New Garden Buffet restaurant. (See Gov't Ex. 3.) She further stated that the restaurant had "some employees [who] are il[l]egal," and that these individuals "sometime[s] live in our house." (Id.) Defendant specifically identified "Jose" as having worked at the restaurant "for 2 or 3 months" and "live[d] at our house on and off," and she stated that "[w]e know Jose is il[l]egal." (Id.) At the bottom of this document, Defendant wrote that "[t]his statement was provided freely and volunt[a]r[i]ly," and she signed her name. The agents testified that Defendant freely agreed to provide this written statement, that she did not appear to have any difficulty in writing it, and that she was not told what to say, apart from Agent Clark's request that she

include the language at the end indicating that she had provided the statement freely and voluntarily.

Defendant's version of this encounter, as offered through an interpreter at the evidentiary hearing, is far different. First, she testified that she remained handcuffed with her hands behind her back for the entire time she was questioned. Defendant further testified that Agent Clark alone conducted the first portion of the questioning, lasting about a half hour, and that he did not advise her of her <u>Miranda</u> rights or show her the corresponding "Statement of Rights" form before he began the interrogation. To the contrary, Defendant testified that she was given this form only after the agents had concluded their questioning, at which point she was instructed to sign its waiver provision. Defendant testified that she was not told to read the form, but only to sign it, and that she did not actually read the form before signing it. Moreover, Defendant testified that she sometimes had difficulty understanding Agent Clark while he was questioning her, and that she requested an interpreter at one point but the agent did not respond.

Defendant also challenged a number of the statements attributed to her in the agents' notes of their questioning. She denied having any knowledge whether any employees of the New Garden Buffet were illegally residing in the United States, explaining that Mr. Chen was responsible for this aspect of the restaurant's operation. Defendant also denied telling the agents that Mexican nationals, whether "Jose" or any

other, lived in the basement of her home. In addition, while Agent Golliday's notes reflect Defendant's statement that she had signed the lease for the restaurant, Defendant testified that she had not signed the lease, and she introduced a copy of the lease that identifies Mr. Chen as the tenant and includes only his signature. (See Defendant's Ex. B.)[9]

Finally, Defendant denied that her written statement was freely and voluntarily given, but instead testified that Agent Clark directed her to write each and every portion of this statement. According to Defendant, Agent Clark backed this instruction with the threat that she would not be allowed to go home and see her children. Defendant further testified that the resulting statement includes a number of falsehoods, including (i) that she owns the New Garden Buffet restaurant, (ii) that some of the restaurant's employees were illegally in the country, (iii) that some of these illegal aliens, including "Jose," lived at her residence, and (iv) that her written statement was provided freely and voluntarily.

More generally, Defendant characterized her command of the English language as "not bad," and she testified that she could understand only some of what was said at the evidentiary hearing without the assistance of an interpreter. Defendant testified that she was born in Vietnam and had come to the United States about 30 years ago, when she was 13 or 14, that she had lived in this country since that time and had become an

---

[9]Similarly, while Agent Clark's notes suggest that Defendant was still married to Mr. Chen, she testified that she was no longer married to Mr. Chen, and she introduced a copy of a judgment indicating that the couple divorced in 2003.

American citizen, and that she had obtained a high school degree in the United States.[10] Defendant further testified that, as a result of growing up in Vietnam, she had learned to obey law enforcement officials and do "whatever they say."

## II. ANALYSIS

Through the present motion, Defendant seeks to suppress the oral and written statements she gave to ICE agents Clark and Golliday during their questioning of her following her arrest on January 31, 2007. Under well-established due process principles, the Government may not introduce at trial the involuntary statements of a defendant made in response to coercive police activity. See Colorado v. Connelly, 479 U.S. 157, 165-67, 107 S. Ct. 515, 521-22 (1986). A statement will be deemed involuntary, and hence inadmissible, if three criteria are satisfied: (i) that the police engaged in "objectively coercive" activity; (ii) that "the coercion in question was sufficient to overbear the defendant's will;" and (iii) that "the alleged police misconduct was the crucial motivating factor in the defendant's decision to offer the statement." United States v. Mahan, 190 F.3d 416, 422 (6th Cir. 1999) (citing McCall v. Dutton, 863 F.2d 454, 459 (6th Cir. 1988)). Where, as here, a defendant contends that her statement was

---

[10]On cross-examination, the Government elicited Defendant's testimony that one of her duties at the New Garden Buffet was to take food orders over the phone, that the callers frequently spoke English, and that she was able to understand these callers. The Government also introduced letters Defendant had written to government officials back in 1997 and 1998 concerning Mr. Chen's immigration and visa status, which evidence Defendant's apparent ability to communicate quite well in the English language. (See Gov't Exs. 8, 9.) Defendant testified, however, that she took some time and had to consult a dictionary in writing these letters.

9

coerced, the Government "bears the burden of proving by a preponderance of the evidence that the [statement] was in fact voluntary." Mahan, 190 F.3d at 422.

Before turning to this more general "voluntariness" inquiry, however, the Court first must address a sizable discrepancy in the testimony at the evidentiary hearing as to whether Defendant was advised of her Miranda rights and agreed to waive them before she was subjected to questioning by ICE agents following her arrest. It is well established, of course, that unless the Miranda warnings are given prior to a custodial interrogation, a suspect's responses to the ensuing questioning may not be offered in the Government's case-in-chief at trial. See Dickerson v. United States, 530 U.S. 428, 431-32, 120 S. Ct. 2326, 2329-30 (2000); Machacek v. Hofbauer, 213 F.3d 947, 954 (6th Cir. 2000). In this case, it is clear that the questioning of Defendant took place in a custodial setting, as she had been placed under arrest, handcuffed, and transported to the ICE office in Detroit. Yet, Defendant testified that the ICE agents did not advise her of her Miranda rights prior to interrogating her, but instead showed her a form listing these rights only *after* they had concluded their questioning. Even then, Defendant testified that the agents instructed her only to *sign* the form, without inviting her to *read* it first. This testimony, if credited, presumably would dictate the suppression of Defendant's responses to the agents' questioning.

The Court, however, credits the testimony of Agents Clark and Golliday over Defendant's contrary testimony on this point. First, and most importantly, the two agents testified entirely consistently on this subject, despite their sequestration. Specifically,

both agents testified that Defendant was fully advised of her Miranda rights before she was questioned at the ICE office, that she appeared to understand these rights, that she asked no questions as Agent Clark informed her of her rights, and that she then signed the portion of the form stating that she "freely and voluntarily" waived these rights. The "Statement of Rights" form itself corroborates the agents' testimony as to the timing of the Miranda warnings, as it indicates that Defendant signed the form at 10:40 a.m., shortly after Defendant and the agents arrived at the ICE office at around 10:30 a.m. Both agents also signed this form, attesting that they had witnessed Defendant signing the waiver of her rights. In addition, the agents' calm and straightforward demeanor as they testified lent further credence to their uniform assertion that Defendant was informed of her Miranda rights before being subjected to questioning.

To be sure, Defendant testified far differently, stating that she was instructed to sign the "Statement of Rights" form only *after* the agents had concluded their questioning of her. Yet, the Court finds the consistent testimony of Agents Clark and Golliday to be more credible on this point, in light of the dubious nature of Defendant's testimony as to this and other matters. First, the Court deems it less than fully plausible that Defendant would have signed the waiver on the "Statement of Rights" form without reading the document, which is not particularly lengthy or difficult to understand. Although Defendant endeavored to explain her failure to read the document by stating that the agents told her only to *sign* the document, without further instructing her to read it, she did not claim that the agents directed her *not* to read the document, or that she requested

but was denied the opportunity to read it.

Moreover, while Defendant testified that she learned as a child in Vietnam to obey law enforcement officials and heed their instructions, she further stated that she has lived in the United States for 30 years, that she is an American citizen, and that she obtained a high school degree in this country. The record also discloses that Defendant has worked in the United States for a number of years, that she owned her own business for several years, and that she handled bill payment, employee hiring, and insurance for this business. In addition, the letters produced by the Government — particularly the letter Defendant sent in September of 1997 to a government official regarding her husband's visa application, (see Gov't Ex. 8) — evidence at least some willingness on Defendant's part to question or challenge governmental action or inaction. Under these circumstances, the Court deems it not credible that Defendant would have failed to review the "Statement of Rights" form before signing its waiver provision, in the absence of any evidence that the ICE agents prevented her from doing so or denied any request to read the document before signing it.

Defendant's testimony also lacked credibility on other points. Most significantly, Defendant strained credulity with her denial of any knowledge that Mexican nationals had lived in the basement of her home, and her further denial that she had ever *seen* any such Mexican nationals inside her home. Agent Clark testified that he observed Mexican nationals leaving the home on two occasions, in August of 2006 and on January 23, 2007. He further testified that the men seen on the second occasion stated that they lived in the

basement of Defendant's residence.  The agent's testimony on this point, moreover, is corroborated by the deposition testimony of one of these two men, Antonio Cupido-Alcudia, who stated that he lived in the basement of Defendant's home for about three months.

Agent Clark further testified that when the two Mexican nationals were observed leaving Defendant's home on January 23, 2007, he and one of these individuals, Antonio, went back into the residence to retrieve the latter's winter coat.  According to Agent Clark, Defendant answered the door and accompanied the men into the basement, stating that nobody was in any of the several rooms located in this portion of the house.  In fact, however, Agent Clark testified that when Defendant complied with a request to unlock the doors to two of the rooms, another Mexican national, Jose Zetina-Hernandez, was discovered hiding in one of the rooms.  Again, this testimony is corroborated by Zetina-Hernandez's deposition testimony that he lived in the basement of Defendant's home and was "caught" there, along with Antonio Cupido-Alcudia and another individual, when immigration agents entered the residence in late January of 2007.

The Government also introduced photographs of four rooms in the basement of Defendant's home, each of which was arranged as a bedroom with its own bed.  Indeed, Defendant acknowledged during her testimony that there were five such rooms in the basement, each with its own bed.  While Defendant testified that these rooms were sometimes used in the summer to avoid the heat, she acknowledged that her home was air-conditioned.  Moreover, Defendant's testimony revealed that the five bedrooms in the

13

basement exceeded the four bedrooms in the remainder of the house that were regularly occupied by Defendant, co-Defendant Guan Han Chen, two children, and another adult resident, Bill Nye.

This record significantly undercuts Defendant's credibility. There is ample evidence that the basement bedrooms in Defendant's home were used by Mexican nationals, and Defendant's testimony was simply not credible regarding the purported use made of these five bedrooms by the home's regular occupants. Indeed, this testimony was inconsistent with Defendant's unsolicited comment, upon being handed the Government's pictures of the basement bedrooms, that she "very seldom go[es] downstairs" at her home. Moreover, to the extent that Defendant evidently sought through her testimony to disavow any knowledge that the basement of her home might have been used to house Mexican nationals who worked at the New Garden Buffet restaurant, it defies belief that Defendant would be unaware of this use of the basement, despite the fact that she and her young daughter lived in this home. Surely, most conscientious parents would be fully aware at all times of the presence of other adults living under the same roof with their children.

Other aspects of Defendant's testimony further undermined her credibility as a witness. She occasionally appeared evasive and defensive on the witness stand, seemingly attempting to forestall inquiries that the Government's counsel had not yet made. The most notable example, as cited above, was when Defendant was asked simply whether she recognized pictures of the basement bedrooms, and she responded that she

14

"very seldom go[es] downstairs" at her home. Yet, she then had no difficulty in recognizing the pictures, and later claimed that she and the home's other regular occupants sometimes used these bedrooms. On other occasions, she did not wait for her interpreter to finish translating the Government's questions during cross-examination, but appeared anxious to anticipate and rebut points that she perceived the Government to be making through its questions. Under this record, considering both the inconsistencies in Defendant's testimony and her demeanor while testifying, the Court credits the uniform accounts of Agents Clark and Golliday over Defendant's testimony regarding the timing of the Miranda warnings and Defendant's voluntary written waiver of these rights before the agents commenced their questioning.

This leaves only the question whether the Government has shown by a preponderance of the evidence that Defendant's oral and written statements in response to this questioning were voluntarily given. In resolving this issue, the Court "looks to the totality of the circumstances concerning whether a defendant's will was overborne in a particular case." Mahan, 190 F.3d at 422 (internal quotation marks and citation omitted). The relevant factors in this inquiry "may include the defendant's age, education and intelligence; whether the defendant has been informed of h[er] constitutional rights; the length and extent of the questioning; and the use of physical punishment, such as the deprivation of food or sleep." 190 F.3d at 422-23.

As noted earlier, the first question the Court must ask in determining the voluntariness of Defendant's statements is whether the Government engaged in

"objectively coercive" activity. Apart from Defendant's claim, which the Court does not credit, that the ICE agents failed to advise her of her Miranda rights before they began their questioning, Defendant further testified (i) that she remained in handcuffs throughout her questioning, (ii) that the agents failed to comply with her request for an interpreter, and (iii) that Agent Clark threatened at one point that she would not be permitted to go home and see her daughter unless she heeded his instruction to furnish a written statement.

As an initial matter, the Court questions the veracity of Defendant's testimony regarding the use of handcuffs throughout her interrogation, her request for an interpreter, and the threat concerning her daughter. The Court already has identified a number of grounds for discounting Defendant's credibility as a witness, and this credibility assessment extends as well to Defendant's testimony regarding the agents' purported use of coercive measures during their questioning of her. Moreover, as to Defendant's testimony that she asked for an interpreter, Agents Clark and Golliday both denied that any such request was made — indeed, Agent Clark testified that he was prepared to provide an interpreter, but Defendant declined this offer. Both agents further testified that Defendant did not evidence any difficulty in understanding their questions, and that her responses were appropriate to the questions asked. And Defendant herself acknowledged that her English was "not bad;" that she had lived in the United States for 30 years, was an American citizen, and had obtained her high school degree in this country; and that her job at the New Garden Buffet entailed frequent communications with customers in

16

English.  For these and the additional reasons stated earlier, then, the Court credits the agents' testimony over Defendant's contrary testimony that the agents ignored her request for an interpreter.

Similarly, the Court does not credit Defendant's claim that her written statement was given in response to a threat that she would not be allowed to see her daughter.  Both agents expressly denied that any such threat was made, and the Court again credits this testimony over Defendant's contrary account.  Moreover, Agent Clark testified to various affirmative measures that the agents employed in order to minimize the impact of Defendant's arrest upon her daughter's daily schedule.  The agents waited until Defendant's daughter had gotten on the bus to school before executing the arrest warrant, and they arranged for Defendant to speak to the other adult at her residence, Bill Nye, to ensure that someone would be at home when Defendant's daughter returned from school.  These measures are inconsistent with the notion that the agents would threaten Defendant's access to her daughter.

In any event, even if the Court were to credit, at least to some extent, Defendant's testimony regarding the measures used by Agents Clark and Golliday during her questioning, the Court finds that these measures would not rise to the level of "objectively coercive" activity that could satisfy the first prong of the test for involuntariness.  First, even assuming that Defendant remained in handcuffs throughout her interrogation, a number of courts have held that this alone does not establish coercion that would render a statement involuntary.  See, e.g., United States v. Cardenas, 410 F.3d 287, 295 (5th Cir.

2005) ("Such basic police procedures as restraining a suspect with handcuffs have never been held to constitute sufficient coercion to warrant suppression." (footnote with citations omitted)); United States v. Doe, 149 F.3d 634, 639 (7th Cir. 1998) (affirming a district court's determination that "transporting [the defendant] to the park and leaving him handcuffed in the squad car during questioning does not in itself render [the defendant's] *Miranda* waiver involuntary"); United States v. Elie, 111 F.3d 1135, 1143-44 (4th Cir. 1997) (rejecting a defendant's contention that his statements were involuntarily made shortly after he was "arrested at gunpoint and handcuffed," where the police had holstered their weapons before the defendant made his statement, and where handcuffing by itself did not establish involuntariness), abrogated in part on other grounds, United States v. Sterling, 283 F.3d 216, 219 (4th Cir. 2002); United States v. Guiterrez, 92 F.3d 468, 471 (7th Cir. 1996) (finding that the defendant had voluntarily consented to a search despite being handcuffed at the time); United States v. Navedo-Colón, 996 F.3d 1337, 1338 (1st Cir. 1993) (finding that the defendant had voluntarily consented to a search despite being handcuffed to a chair).

Next, even assuming that the agents ignored Defendant's request for an interpreter or made a remark that Defendant perceived as a threat that she would not be allowed to see her daughter, the Court would nonetheless conclude, under the totality of the circumstances, that the agents' conduct did not rise to the level of "objectively coercive" activity. Defendant testified that she made only one request for an interpreter, and that only one threat was made about her daughter. These isolated events, if taken as true,

18

must be weighed against a number of other factors that are not indicative of a coercive setting, including (i) the relatively short duration of Defendant's interrogation, which lasted about an hour; (ii) Defendant's waiver of her Miranda rights, which this Court has found to be knowing and voluntary; (iii) the absence of any use or threat of physical force or punishment, apart from the purported use of handcuffs; and (iv) the agents' uniform testimony that Defendant exhibited a calm demeanor throughout her questioning and did not appear to be in any distress. Viewed as a whole, this record does not establish a level of government behavior that could be characterized as "objectively coercive," even if the Court were to credit these aspects of Defendant's testimony.

In the absence of any objectively coercive activity, the Court need not proceed beyond the first step of the three-part standard for involuntariness. See Connelly, 479 U.S. at 167, 107 S. Ct. at 522. It does not matter, in particular, that Defendant might have been predisposed to cooperate with law enforcement officials in light of her upbringing in Vietnam. Rather, because the Court has found that the ICE agents did not apply objectively coercive measures in their questioning of Defendant, the oral and written statements she provided during this questioning are not subject to suppression.

### III. CONCLUSION

For the reasons set forth above,

NOW, THEREFORE, IT IS HEREBY ORDERED that Defendant's March 9, 2007 motion to suppress evidence is DENIED.[11]

                                      s/Gerald E. Rosen
                                      Gerald E. Rosen
                                      United States District Judge

Dated: March 10, 2008

I hereby certify that a copy of the foregoing document was served upon counsel of record on March 10, 2008, by electronic and/or ordinary mail.

                                      s/LaShawn R. Saulsberry
                                      Case Manager

---

[11]The Court notes that Defendant's motion remained under advisement for more than 30 days after the parties filed their supplemental briefs in the aftermath of the July 26, 2007 evidentiary hearing. See 18 U.S.C. § 3161(h)(1)(J); see also United States v. Robertson, 260 F.3d 500, 504 (6th Cir. 2001). Nonetheless, the Court finds that a continuance encompassing this additional period would serve the ends of justice and would outweigh the interests of the public and the defendants in a speedy trial, see 18 U.S.C. § 3161(h)(8)(A), where this additional time was necessary to review the somewhat lengthy evidentiary record — including the testimony at the July 26 hearing, the deposition transcripts of three Mexican nationals who were deposed by the parties before their deportation, and the other materials produced at the hearing — as well as the relevant case law as identified by the parties and in the Court's own research. The Court further notes that a portion of this additional period is excludable for speedy trial purposes by virtue of a motion recently filed by co-Defendant Guan Han Chen, and that other portions of this period might be excludable due to Mr. Chen's two court-authorized visits to Defendants' 9-year-old son, who is residing with relatives in China.